G. B. Mathers and Violet Mathers v. Commissioner. G. B. Mathers v. Commissioner. Violet Mathers v. Commissioner.
G. Mathers v. Commissioner
Docket Nos. 17424, 17425, 17426.
United States Tax Court
1949 Tax Ct. Memo LEXIS 106; 8 T.C.M. (CCH) 747; T.C.M. (RIA) 49211; August 18, 1949
*106 Arthur Glover, Esq., and Walter G. Russell, C.P.A., Amarillo Bldg$ , Amarillo, Tex., for the petitioners. J. Marvin Kelley, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: These proceedings were consolidated and involve deficiencies in income tax, the amount in Docket No. 17424 being $4,945.82 for 1944, and the amount of each of the remaining docket numbers being $8,764.26 for 1945. The issues in 1944 are whether the respondent erred in (1) understating by $23,195 the cost of cattle sold; (2) including in income gain realized from the sale of 175 head of cows; and (3) reducing cattle sales in the amount of $17,500. The issues in 1945 are whether there should be included in community income the amount of $32,169.94 for sales of cattle, and whether the respondent erred in allowing the amount of $3,338.33 as expenses of the community. Findings of Fact The petitioners are husband and wife, residing at Canadian, Texas. The joint income tax return of petitioners for 1944, and individual returns filed for 1945 on the community property basis, were filed with the collector for the second district of Texas. Petitioner G. B. Mathers, *107 hereinafter sometimes referred to as petitioner, moved his family to Canadian, Hemphill County, Texas, in 1926. His occupation at that time was rancher. During the period from 1930 to 1945, inclusive, petitioners were engaged in the business of farming and ranching. They kept their books on the cash basis. One of the sons of petitioners, William LeRoy, hereinafter referred to as Bill, was born September 29, 1923, and another son, Samuel Frank, hereinafter referred to as Frank, was born in June 1926. While infants, Bill and Frank received gifts of money, livestock, horses, and riding equipment from their parents and relatives. The livestock was run on petitioner's ranch and disposed of with cattle owned by petitioner, some during the depression in the thirties. The money was placed on deposit in a bank at interest. The bank discontinued the payment of interest on deposits, and in 1933 the balances in the accounts, a total of $355.95, were withdrawn and deposited in a checking account of petitioner, so that the boys would have an interest in the business of petitioners. At that time the petitioners were very short of funds. Frank and Bill learned to ride during their early childhood *108 and at that time started to assist their father in the performance of ranch duties. During the period from 1935 through 1945, petitioner's ranches were stocked with a herd of about 1,000 cows. A cow herd requires about twice as much work as a stocker herd of the same size. In 1936 and 1937, petitioner had a herd of brood mares, and sold horses. Petitioner was in complete charge of the ranches, and determined the amount of feed for the cattle. Petitioner's ranch at Canadian, where he maintained his home, consisted of about 6,000 acres. Additional acreage was leased for summer pasturage in order to winter as many cattle as possible at the Canadian ranch. As Frank and Bill grew older they were able to and did render greater service to their father on his ranches. The services were rendered consistently during the periods when they were not attending school, and consisted of feeding cattle, breaking colts, branding stock, repairing fences, and other work connected with the operation of a large cattle ranch. Petitioner had one hired hand on his ranches until February 1942. No salary was paid to Bill or Frank for their services. The school they attended was located near the ranch on *109 which petitioner maintained the family home. Prior to 1940, Frank and Bill raised 4-H calves for show cattle. They became dissatisfied in such work and expressed to their father a desire to establish a herd of their own. Thereafter, in 1940, petitioner permitted each of his sons to select and brand 25 heifers from his herd as replacements for the stock of the boys which he had sold during the depression, and to enable the boys to start herds of their own. The boys branded the heifers with their father's brand, and Frank branded his heifers with the letter "V" on the left jaw and cropped their right ears, and Bill branded his stock with a circle on the left jaw and cropped the left ears. Their father's brand consisted of a diamond on the left hip. A calf is branded at the age of from one month to six months, before weaning. The petitioner's brand was well known in the community and served as ready identification whenever the cattle got off the ranch. The heifers acquired by the boys, and stock owned by the hired hand, were run with cattle owned by the petitioner. The hired hand branded his stock with the initial "L" on the shoulder in addition to the brand of petitioner. All of the *110 children of neighbors of petitioner had cattle of their own. The heifers acquired by Frank and Bill produced a 100 per centum calf crop when they were two years old. Two cows owned by Frank died during the calving period and they were replaced by petitioner so that each of the boys would have the same number of cows. Frank traded the steer calves of his crop with his father for heifer calves. Trades were made by both sons from the calf crop in 1942 and 1943. The sons branded the calves acquired by them with their own brands. Petitioner supplied the pasturage and feed for the cows and calves. In the fall of 1942, Bill sold eleven steers for $860.20. The proceeds of the sale were placed in the bank account of his father, against which Bill had a right to draw checks. He rarely did so. In his income tax return for 1942, Bill reported total receipts of $860.20 from a ranch business and taxable income therefrom of $1,815.20 based upon receipts and an increase of $955 in inventories during the year. Bill became dissatisfied with the sale he made of steers because Frank then had more cattle than he had. Thereafter, in 1942, Bill discussed it with his father and petitioner agreed to *111 sell to him, for the amount in the bank account from the sale, enough heifers to make his herd equal the number and age of Frank's. At the close of 1942, Bill and Frank had an equal number of cattle. During 1942, the hired hand entered the military service. Thereafter petitioner was unable to employ permanent help on his ranches. The winter of 1943 and 1944 in Hemphill County was a severe one. At times, on account of inability to hire help, it was necessary for petitioner to do the feeding on both of his ranches with only the help of Frank when he was not in school. Bill graduated from high school in the spring of 1940 and thereafter attended college until December 1942. He entered the military service in January 1943 and received his discharge therefrom on November 6, 1945. He served in the Mediterranean theatre of operations. Frank entered the military service on March 4, 1944, and was discharged therefrom in April 1946. He served in the China-Burma-India theatre. At the time Frank entered the military service, petitioner was operating two ranches containing more than 30 sections. Prior thereto Frank and his father discussed the question of what should be done with their herds *112 of cattle on account of inability to obtain adequate help to care for them. It was decided that the herds of Bill and Frank should be sold and that the proceeds should be invested in stocker cattle. Frank had an understanding with his father that if stocker cattle were purchased for him that he and Bill would share the expense of operation on the basis of the number of cattle they had. In the fall of 1943, Frank recorded in his tally book as his cattle 23 four year old cows, 22 two year old heifers, 23 yearlings, and 2 three year old cows. The tally book contains no other entries. The figures did not include calves or yearlings. Calves and yearlings were not included in the sale in May 1944; that sale covered only grown animals. Frank did not sell any of his calf crop prior to 1944. Calves are not counted among cattle until they are weaned. They are branded at the age of from one month to six months. On November 1, 1943, petitioner re-recorded with the clerk of the county court, Hemphill County, Texas, a diamond brand on the left hip and Bill recorded, as his brand, an open nine on the left shoulder. On February 12, 1944, Frank recorded, as his brand, a lazy diamond on the left *113 shoulder. In May, 1944, petitioner sold 726 head of cows for $70,650. Petitioners informed Bill and Frank by letter of the sale of their cattle, and that the proceeds had been invested in heifers. The heifers were from petitioner's herd of cattle. Petitioners, on March 15, 1945, reported the transaction in their joint return for 1944 as a sale resulting in longterm capital gain of $29,208.50, cost or other basis used being $41,441.50, of which one-half was to be taken into account. The cows sold were reported as "397 cows bought as heifers and yearlings in 1938 at $37.50"; also 329 purchased in 1940 and 1941 at $62.50 and $90, respectively. The original return shows a net loss from business or profession of $19,849.08, and after capital gain, net loss of $5,244.83. It contains a schedule of depreciation sustained showing, as to a large number of items, date of acquisition, cost, rate, reserve, and depreciation sustained, total $1,449.30. It is signed by G. B. Mathers and Violet Mathers, and Walter G. Russell, C.P.A., as the person preparing it. It was filed with the collector on March 15, 1945. In an amended return filed on June 14, 1946, petitioners eliminated from taxable income *114 $5,468.75 as representing 50 per centum of the gain on the sale of 175 head of cows for $17,500, which cows had been purchased at $37.50 each, and added $17,500 for sales of cattle not previously reported. In a partnership return prepared in 1946 for the year 1944, Bill and Frank reported long-term gain of $17,500 from the sale of cattle having no basis and that one-half of $8,750, the taxable portion, was distributable to each partner. The partnership return lists the cattle as to "Date acquired" as "Various, all over 2 yrs." and the column for "Date sold" is filled with the figures "1945." The distributive shares were reported by Bill and Frank in individual income tax returns filed on June 14, 1946, for the year 1944. Frank did not in the years 1940 to 1944, inclusive, return any cattle for county taxes. He and Bill were assessed school district taxes on cattle for 1944. During the years 1941 to 1945, inclusive, the inventories rendered by petitioner to the county assessor for real and personal property covered the cattle on his ranches. In 1941 he rendered 175 cows and 300 calves; in 1942, 600 cows, 500 calves and 18 bulls; in 1943, 675 cows and 14 bulls; in 1944, 500 cows, 200 *115 steers, 200 heifers, 15 bulls and 200 calves; and in 1945, 1,000 yearling steers and 3 bulls. For the years 1941 to 1944, inclusive, his affidavit recited that the property listed was "owned or held by me in my name for self," the word "self" being filled in in the blank in the printed form. The petitioners had 1,260 cattle in 1941, 1,598 in 1942, and 1,254 in 1943. Inventories of property to the school district for taxation for 1944 showed Frank owning 32 two year old heifers and 50 yearlings and Bill owning 32 two year old heifers and 45 yearlings. For 1945, the inventory of Bill and Frank to the school district showed 64 two year old heifers and 300 yearling heifers. The inventory of property for ad valorem taxes returned to the county for Bill and Frank Mathers for 1945, signed by G. B. Mathers, showed them as owning 64 two year old heifers and 300 one year old heifers. Petitioner in 1945 sold, for the boys, cattle for $32,169.94. Bill was consulted about the sale and agreed to the terms thereof. Frank never saw the cattle. Petitioner received the proceeds of the sale and deposited the money in his checking account. Cattle usually sold in the fall. Bill and Frank filed a partnership *116 return on May 31, 1946, for 1945, in which they reported a sale of cattle for $32,169.94, from which they deducted $20,838.33, consisting of the following items, in arriving at $11,331.61 as the net profit of the partnership business: Cost
$17,500.00
Labor
669.98
Feed, seed, and salt
1,213.73
Pasture rentals
1,454.62 One-half of the net profit was shown in the return as distributable to each partner. Such amount was reported by Bill and Frank in individual returns filed on May 31, 1946, for 1945, as income from the partnership. Of the proceeds of the sale of cattle in 1945 for $32,169.94, the amount of $23,068 was used by petitioner later in that year in the purchase of 292 head of cows, known as the Bell cows, for Bill and Frank, one-half for each. The stock had the seller's brand on them. Part of the herd was sold in January, 1946. In the spring of 1946, Bill and Frank bought about 300 head of yearling steers. Bill paid for the stock with his own funds after making a bank loan of about $23,000. Upon his discharge from the Army in April, 1946, Frank formed a partnership with Bill to operate a ranch in Wheeler County, Texas. In 1946, each of the sons received *117 a check for $10,000 from petitioner in a final accounting of their cattle transactions. The checks were used to open checking accounts. Several months later they loaned the money to their parents and as evidence thereof each received a note from the borrowers for $10,000, with interest at 4 per cent. Interest, the amount not being shown, has been paid on the note held by Frank. Credits have been made on both of the notes for rental of pasture from petitioner. The partnership between Bill and Frank was dissolved about 1947. Bill entered into the ranch business for himself. At the time of the hearing, Bill was operating as sole owner of a ranch consisting of about nine sections, stocked with about 450 head of cattle, and Frank and an uncle were operating, under a partnership entered into in October, 1947, a ranch consisting of more than twelve sections, on which they were running about 1,000 head of cattle. In 1945 petitioners sold livestock for $113,962.22, the cost being $62,624.45. Net income of $37,069.86 was reported. In 1943, the petitioner and Arthur Webb, who operated a ranch west of the Mathers ranch, purchased some calves known as the Todd cattle. The cost to petitioner *118 was $26,046.40. None of the cattle was sold in 1943. The Todd cattle owned by petitioner were sold in the fall of 1944, for $36,906.79. In 1943, petitioners purchased approximately 357 head of cattle at a cost of $23,195, which cost was deducted by the petitioners in that year as an expense. The cattle were sold in 1944. In addition to the sale of 726 cows for $70,650, petitioners reported in their return for 1944 cattle sales in the amount of $39,095.33, and a cost thereof of $24,495. On June 14, 1946, in addition to petitioners' amended return for 1944, the following Federal income tax returns were filed with the collector: The partnership return of Bill and Frank Mathers for 1944; the individual return of Bill Mathers for 1944; and the individual return of Frank Mathers for 1944. On May 31, 1946, there were filed the following returns: Partnership return of Bill and Frank Mathers for 1945; individual return of Bill Mathers for 1945; and individual return of Frank Mathers for 1945. In determining the deficiency for 1944, respondent disallowed $23,195 as cost of cattle sold in that year upon the ground that the amount was deducted in full in 1943, and increased taxable capital *119 gain by $397 on account of a clerical error in computing the cost of cattle sold. In computing the deficiences for 1945, he increased the amount of sales of cattle by $32,169.94, on the ground that the amount was taxable to petitioners, and not their sons, and allowed a deduction of $3,338.33 for operating expenses, the amount having been claimed as a deduction in the partnership return filed by the sons. G. B. Mathers and the certified public accountant who prepared the income tax returns described above were present at the trial, but neither testified. Opinion The first issue relates to the disallowance by the respondent in 1944 of $23,195 as cost of cattle upon the ground that all of the amount was deducted in 1943. Respondent admitted in his answer that the petitioners deducted as an expense in their return for 1943 the amount of $23,195 as the cost of cattle purchased in that year and that the cattle were not sold until 1944. At the hearing, petitioners agreed to stipulate that cattle costs were overstated in their 1943 return in the amount of $26,046.40 and to pay any deficiency for 1943 after adjusting the error. Respondent consented to so stipulate, provided his adjustment *120 applied to the same cattle purchased in 1943 and sold in 1944. They further stipulated that the cost is deductible in the year in which the cattle were sold and not in the year in which petitioners purchased them. The issue turns upon the identity of the cattle sold. Petitioners reported long-term gain on the sale in 1944 of 726 cows purchased in 1938, 1940, and 1941. The respondent made no adjustment with respect thereto other than to reduce the cost claimed by $794 on account of a clerical error. The disallowance in question was made in sales of cattle, taxable as ordinary income, for $39,095.33, for which cost of $24,495 was claimed. Petitioners insist that the error occurred in connection with the sale of the so-called Todd cattle. Respondent says such identification was not made by evidence submitted at the hearing. We agree with the petitioners. The uncontradicted testimony is that the Todd cattle were purchased in 1943 and that none of them were sold until 1944, when the price of $36,906.79 was obtained. Other sales of cattle in that year, taxable as ordinary income, amounted to no more than about $2,200. The effect of respondent's adjustment was to reduce cost of the *121 cattle to about $1,300, an amount which obviously does not include the cost of the Todd cattle. Under the circumstances, it is apparent that the adjustment made by the respondent related to the Todd cattle. If petitioner had not previously taken any deduction as to such cattle they, of course, would be clearly entitled to it in 1944. They admit that they had taken the deduction in 1943, but the parties agree that this will be eliminated by adjustment for 1943. The respondent suggests that it is necessary to show that the cost item applies to the Todd cattle. This seems logically unnecessary, for though, of course, if it does apply to the Todd cattle the petitioners are entitled to the deduction in 1944, since it is being wiped out for 1943, nevertheless if the cost item applied to some other herd of cattle purchased in 1943, this would leave no deduction as to the Todd cattle in 1943 and petitioners, therefore, entitled to it in 1944. Also, since the deduction is being eliminated for 1943, it would free any other cattle, as to which it had been taken in 1943, of improper deduction and permit deduction of the amount when the cattle were sold. The Todd cattle cost $26,046.40 but petitioners *122 make no claim for allowance as cost of the amount thereof in excess of $23,195. Accordingly, under Rule 50, the adjustment will be limited to an allowance of the amount disallowed by respondent as cost. The next question is whether the Commissioner erred in accepting the petitioners' original return as correct, as to the sale of cattle for $70,650, or whether he should have accepted the amended return, eliminating from the $70,650, $17,500 on the theory that that amount had been erroneously included in petitioners' income, because the income from sale of 175 head of cattle at $100 each, which belonged to petitioners' sons, Frank and Bill. Obviously the petitioners in a sense have a double burden. First, the determination of deficiency is presumed to be correct, and, second, petitioners must show that their own statement in their original return was wrong. Made early in 1945, when the matters covered were more nearly current, it reasonably more nearly represents fact than a return filed in June, 1946. We are not convinced that the original return was wrong. In the first place, although the return was signed by the petitioner, G. B. Mathers, and prepared and signed by a certified public *123 accountant, and though both of them were at the trial, neither testified nor explained why the original return included the boys' cattle instead of petitioners', to the extent of 175 head, or that the sales price of the boys' cattle was returned by petitioners. G. B. Mathers, under the evidence, was in general charge of the matters here involved, making the sales and receiving the funds. The original return is not a crude affair prepared by a petitioner with no business experience. On the contrary, it is in detail, as evidenced by an extended schedule of depreciation showing exact dates of acquisition, cost, rate, reserve, and depreciation in 1944; also a detailed statement of operating receipts and expenses with a net loss of $19,849.08. Long-term capital gain is explained in detail. It is obvious that G. B. Mathers and the certified public accountant who prepared the original return could have afforded us some explanation as to why it was erroneous, if that be the fact. Evidence in the possession of a taxpayer is presumed to be unfavorable when he fails to testify. (July 26, 1949); . *124 The petitioners' proof is merely to the effect that the boys owned 175 cattle and traced such ownership from 50 heifers turned over to them by their father in 1940, resulting, it is claimed, in a herd of 175 sold in May, 1944. The respondent, arguing from the fact that the petitioner, G. B. Mathers, at all times made any sales of cattle, in his own name, together with the fact that the work that the boys did around the ranches and small amounts of presents and cattle to them in infancy (upon which fact petitioners rely as reason for the 50 heifers being turned over in 1940) is of no realistic importance, argues that the petitioners and not the boys were the real owners of the cattle under the doctrine of unfettered command of income. ; also . Upon all the evidence, however, we have come to the conclusion that the boys did own some cattle in 1944. This obviously does not prove, however, that they were then sold or that if they were sold the petitioners erroneously included the sales price in their original return and the Commissioner erroneously determined deficiency. After much study of all the *125 evidence, we have concluded that a showing of such error has not been made. Several reasons compel this conclusion. The original return reported sale of "397 cows bought as heifers and yearlings in 1938 at $37.50"; also 140 cows bought in 1940 and 189 cows bought in 1941. The boys' cattle, if included at all, were included in the 397 cows, for it is therefrom that the amended return eliminates them. But the 397 cattle could not include the boys' herd, for the boys' herd started with 50 heifers branded in 1940 and, therefore, the oldest could not be more than five years old in May, 1944; whereas the 397 cows had been purchased in 1938 "as heifers and yearlings" so in 1944 would be at least six or seven years old. Obviously, the mere fact that the boys owned some cattle starting with some heifers in 1940 does not explain this situation; and as above stated, the parties who prepared and signed the return did not otherwise explain it. It is true that Violet Mathers testified, but she explained nothing as to the preparation of the return. Careful examination of the facts also convinces us that the sale of the 397 cattle in 1944 could not have included 175 head owned by the boys for *126 the simple reason that under the evidence they did not have that many of the age sold. The evidence is that the father sold the "grown cattle," and that the sale did not include calves or yearlings, that Frank tallied his holdings in September, 1943, at a total of 70 head, not including calves, and that Bill had about the same number. This would make 140 head of cattle for the two boys in September, 1943, and no greater number were included in the sale, under the evidence, since it did not include any calves born in 1944 nor the yearlings, which were the calves for 1943 not listed in Frank's tally. Retention of the calves and yearlings is borne out by the ad valorem tax returns made for the boys to Canadian Independent School District for 1945 for they are reported as then owning 64 two year old heifers, which would be calves born in 1943. The inventory of property rendered for taxation for 1945 for the boys by their father also shows them as owning 64 two year old heifers. Furthermore, in the boys' partnership return for 1944 the recitation under the column "Date acquired" of "Various, all over 2 yrs." indicates that if the sale was in 1944 it did not include the calves born after *127 1942. Also, there is conflict with the idea of sale of 175 cattle for the boys in 1944, in the returns made for them to Canadian Independent School District for taxation for 1944; for the return as to Frank shows him owning only 32 two year old heifers and 50 yearlings, while the return for Bill shows him owning only 32 two year old heifers and 45 yearlings. These returns are not dated, but they are apparently as of a date after the alleged sale of the boys' 175 cattle in May, 1944, for, of course, prior to the sale they had other cattle older than two years, that is, had the cattle originally branded in 1940 and any offspring therefrom. Even if the returns were made before the alleged sale of 175 head, and all the older cattle had been disposed of - which the evidence refutes - the two returns total only 159 head instead of 175. It is to be noted that these returns to the school district for 1944 indicate that even the two year old heifers, that is, born in 1943, were not sold in May, 1944, which would cut down the number in any sale of the boys' cattle by 64 head. The evidence before us not only fails to prove but negatives the sale of 175 head of cattle for the boys in May, *128 1944. There is evidence, of course, that a sale was made at that time and a newspaper item about a sale of 700 cows for $70,000 includes "and sons" with George B. Mathers as selling. But the fact that the boys owned some cattle, and that some were sold, can not logically, in the face of the facts above recited, demonstrate that the petitioners in selling 397 cows bought as heifers and yearlings in 1938 sold the boys' cattle, or that $17,500 was erroneously included in petitioners' income in that year. In concluding, as above, that the boys had available for sale as grown cattle (not calves or yearlings) not more than 140 head in 1944, we have assumed that the heifers branded in 1940 bore calves in 1941. If they did not bear calves until 1942, of course the number would be much smaller. The evidence is in a state of conflict as to when the first calves were produced. Both boys, with some hesitation, used the expression "I believe" when referring to the time when the first calves were produced, and Frank at first "wouldn't be certain as to the year" as to which year it was, and had stated that it was 1940. In other statements they are more definite. They are definite that they got *129 the cattle in 1940, and the evidence is positive that the boys branded them themselves, putting the father's brand on the hips and their brands on the jaw, and cropping the ears. The cattle acquired by the boys in 1940 were repeatedly referred to as heifers. Though Frank testified that what they acquired in 1940 were yearlings between a year and two years old, the evidence is positive that a calf is branded at the age of from one month to six months, branded before weaned; also that calves are produced when heifers are two years old. Since, under the evidence, the father's brand was put upon these heifers by the boys when they were selected by the boys in 1940, this indicates strongly that they were then not more than six months old; therefore, that they did not produce calves until 1942. That the first calves were produced in 1942 is indicated by the fact that the tax returns to the school district for 1944, for the boys, indicated two year heifers and yearlings, but no three year cattle. The evidence is clear that the two brothers selected the heifers; "We branded them ourselves, my brother and I did" and "We put my father's brand on the hips" in addition to the boys' brand. Though *130 there is also other evidence as to calves produced in 1941, we have been unable to make a finding as to when the first calves were produced. It is not reasonable, under the evidence, to believe that yearlings, or older, had been left unbranded, and the fact that calves are branded at six months or less is to the contrary. This leaves the matter in a state of failure of proof as to the number of cattle that were "grown" - an expression twice used for the cattle sold in 1944 - at the time of the sale, which allegedly includes the 175 head belonging to the boys. Without a calf crop in 1941, the boys' cattle, above yearlings, would be fifty less than the 140 discussed above, for the first crop was 100 per cent. But more important, perhaps, than the above figures, is the fact that the record is devoid of proof, assuming sale of the boys' cattle, that the price of any cattle belonging to the boys was included in petitioners' original return for 1944. The original return includes the $17,500 here involved, in price of certain described cattle, not those of the boys. It is not shown that those certain cattle were not sold. The record here is consistent with sale of the boys' cattle, without *131 inclusion of the sales price in the father's income; and he does not explain. We conclude and hold that the petitioners have failed to show error in their original return and to show that the Commissioner erred, acting in accordance therewith, in including in petitioners' income for 1944 $17,500. The boys owned some cattle, the number of which at the time of the sale in May, 1944, is undetermined, but there is failure of proof as to whether they were included in the 397 cows sold at that time (with 329 others not claimed to have included the boys' cattle). We can not hold that the petitioner included the purchase price in his income. The indication, on the contrary, is that the full $70,650 received by him was from other cattle. Doubt is cast upon the question as to whether the cattle were sold at all in the year 1944 by the further fact that in the return for 1944, for the boys, filed in 1946, and reporting the sale of cattle for $17,500, the column "Date sold" is filled with "1945." The amendment of petitioners' original return is on the theory that the boys' cattle were sold for $100 each. But the average price for the 726 head, sold for $70,650, is about $97 each. If it was *132 possible, in 1946, to identify, out of the 726 head, 100 particular cattle as having sold in 1944 for $100 each, the father could hardly, in that year, have been unaware that he was selling those particular cattle, that is, the boys' cattle, instead of cattle bought in 1938 as originally stated. All this, with the failure to explain the recitations in the original return, except indirectly by the fact of ownership of some cattle by the boys and sale thereof, has contributed to our conclusion that as to 1944 petitioners have failed to demonstrate error in the deficiency. The petitioners allege error also in that they are not chargeable with income of $17,500 from the sale of cattle to their sons in 1944. This also was not reported in the original return, and, like the matter of the sale of the cattle in May, 1944, logically appears fresher in petitioners' minds when the original return was filed in March, 1945, than when the amended return and those for the boys were filed June 14, 1946. Though there is evidence of what the petitioners call a sale to the boys, for the $17,500 asserted to be their income from the sale of heifers in May, 1944, the matter depends upon the sale of the *133 boys' heifers, and such evidence is, for the reason set forth above, insufficient to indicate that the boys sold enough cattle to have $17,500 with which to make repurchase in that amount; and it is not sufficient to put any such transaction in 1944. We hold that the petitioners have not shown cattle sales of $17,500 in 1944, in addition to those shown in the original return, or that the Commissioner erred in not so determining. This brings us to 1945, in which cattle were sold for $32,169.94. Was the income that of petitioners, or the sons, that is, were the cattle those of the parents, or the boys? Studying all of the evidence, which is not free from inconsistencies, we are of the opinion that the cattle sold in 1945 were those of the boys, and the income theirs. Though the evidence fails to show sale in 1944 of heifers to the boys, we think they did acquire cattle, at some time prior to the sale in 1945, regardless as to whether such acquisition was by sale or mere gift or exchange for earlier holdings. These cattle, the evidence shows, were sold in 1945 and the proceeds reinvested. That the matter was handled by the father is seen as, in effect, necessary, for both sons were *134 in the armed forces. They received the benefit of the sale. They filed returns showing the sale after return to private life, and continued to do business with the proceeds. The cattle were considered and recognized as theirs, and the fact that the petitioners had earlier owned them does not show continued ownership in petitioners. Irrespective of reason, they had transferred title to the boys. Further evidence of ownership of the cattle in the sons is shown by a final settlement made with them in 1946, in connection with which each of them received $10,000 and were charged for care and feed for the cattle sold in 1945. There is nothing in the record from which to question the bona fides of the final accounting. It constitutes additional recognition by petitioners of ownership of the cattle in their sons. Further discussion of the facts appears unnecessary. From a consideration of all of the evidence, we conclude that the sale made in 1945 is not taxable to petitioners. Petitioner alleged as error of respondent the allowance to petitioners of $3,338.33 in 1945 as a deduction for labor, feed, seed, salt, and pasture rentals charged the sons in connection with the care of the cattle *135 sold in 1945. That the expense was incurred is not questioned by the determination, and the question is merely as to whose expense it was, that is, as to whose cattle. From the conclusion reached above, that the sale in 1945 was taxable to the sons, it follows that such action was erroneous, the amounts not being contested on other grounds. Decisions will be entered under Rule 50.